# Illinois Official Reports

## Appellate Court

*In re Estate of Kirk*, 2017 IL App (4th) 160416

| | |
|---|---|
| Appellate Court Caption | *In re* ESTATE OF ILENE C. KIRK, an Alleged Disabled Person, PHILIP E. DAWSON, Petitioner-Appellant, v. JOHN A. DAWSON, Respondent-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-16-0416 |
| Filed | February 28, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 14-P-300; the Hon. Holly F. Clemons, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | Nicholas N. Tinsman (argued), of Barnhart, Tinsman & Lane, Ltd., of Canton, for appellant.<br><br>Donald R. Parkinson, of Parkinson Law Office, of Urbana, and John T. Phipps, of John T. Phipps Law Offices, P.C., of Champaign, for appellee.<br><br>John B. Hensley, of Hensley Law Office, of Champaign, guardian *ad litem*. |

Panel               JUSTICE HARRIS delivered the judgment of the court, with opinion. Justices Steigmann and Appleton concurred in the judgment and opinion.

**OPINION**

¶ 1        Petitioner, Philip E. Dawson, petitioned the trial court to appoint him the guardian of his elderly mother, Ilene C. Kirk, and her estate, alleging she was a disabled person and unable to care for herself or her property. The court dismissed Philip's petition, and he appeals. We affirm in part, reverse in part, and remand for further proceedings.

¶ 2                                    I. BACKGROUND

¶ 3        On November 4, 2014, Philip filed the guardianship petition at issue. At the time, Ilene, who was born on July 18, 1920, was 94 years old. The record reflects Ilene lived in Champaign, Illinois, and had two living sons, Philip and respondent, John A. Dawson. Philip resided in Jerome, Idaho, while John also resided in Champaign.

¶ 4        In his petition, Philip alleged that he was Ilene's designated agent under health-care and property powers of attorney, which had been executed in April 2012. He asserted Ilene currently resided with John and, because she was unlicensed and incapable of driving, was dependent upon John for transportation. Philip further alleged that, due to her age, Ilene's mental abilities had "reduced dramatically." According to Philip, Ilene (1) was often unable to remember or recall the identity of immediate family members, including Philip; (2) was often confused and disoriented as to time and place; (3) had a "hard time" with both short-term and long-term memory; (4) was unable to make day-to-day decisions for her own medical care, as evidenced by her refusal to go to the doctor or cancellation of doctor's appointments scheduled by Philip; and (5) was unable to attend to her day-to-day financial affairs, potentially subjecting her "to financial exploitation if a guardian of her estate [was] not appointed." Philip asserted he was concerned that Ilene had already been exploited financially.

¶ 5        Philip further alleged that he had made more than one appointment for Ilene to visit her primary care physician so that her physical and mental health could be assessed. However, he maintained she had "not been delivered" to her physician's office, and Philip believed John had cancelled Ilene's appointments. Philip also alleged he made numerous attempts to have meals delivered to Ilene by "meals on wheels" but, each time a delivery was attempted, it was refused by John. Philip maintained he was fearful for his mother's mental and physical health and believed she was unhealthy due to poor nutrition and improper medical care. Additionally, Philip alleged he was "fearful that assets of the Kirk Family [Revocable Living] Trust [had] been exploited contrary to the provisions of the Kirk Family Trust documents."

¶ 6        Philip asserted that, pursuant to section 11a-9 of the Probate Act of 1975 (Probate Act) (755 ILCS 5/11a-9 (West 2012)), it was necessary for the trial court to order appropriate evaluations to be performed on Ilene and that a report be prepared and filed with the court. Additionally, he stated it was necessary that a guardian of the person and estate be appointed for her because she was unable to care for herself and her property. Philip asserted he was qualified and willing to act as guardian and asked that the court appoint him.

¶ 7    The same day he filed his guardianship petition, Philip filed motions for the appointment of a temporary guardian for Ilene and for the appointment of a guardian *ad litem* (GAL).

¶ 8    On December 15, 2014, Ilene filed an objection to Philip's petition, asking that it be "dismissed and stricken." She asserted she had income to support herself and desired to remain at her current residence. Ilene denied that Philip was her power of attorney. Rather, she stated John was her power of attorney "for both legal and medical matters." The objection further stated as follows:

"Ilene is able to express herself and can make her day to day decisions, and has been with her Carle [Physicians Group] doctors addressing any needed medical care. Her son, John ***, has been assisting her and he is her choice for being her representative. She has seen her doctor as needed. She is able to discuss and decide her financial affairs and asks questions of her chosen representative. She does not want Philip *** making any decisions or taking her property. She rejected the food that Philip ordered for her and he knew she didn't like it. She eats food that she wants, and her physical health is good for a woman of her age."

¶ 9    On April 14, 2015, John filed a response to Philip's petition. He maintained that documents identifying Philip as Ilene's health-care and property power of attorney were revoked and, on November 25, 2014, replaced with documents naming John as Ilene's agent for health-care purposes and property transactions. Further, John denied allegations that he lived with Ilene, stating that although he was "at her home most of the time he ha[d] his own residence as needed." Additionally, he denied Philip's allegations that Ilene's mental abilities were "reduced" due to her age and asserted Ilene "may have been subject to financial exploitation by" Philip during the time he acted as Ilene's agent. Attached to John's response were documents executed on November 25, 2014, which identified him as Ilene's agent under health-care and property powers of attorney.

¶ 10    Also on April 14, 2015, Ilene filed an exhibit in support of her objection to Philip's petition. The exhibit contained a letter authored by Dr. Nasreen Syed with the Carle Physician Group. The letter, dated April 9, 2015, addressed "To Whom it May Concern," stated as follows: "Mrs. Ilene Kirk is my patient. She is able to communicate and express herself. She is able to make her own day to day decisions. She is oriented to time and place and person and was last seen in our office on [March 4, 2015]."

¶ 11    On April 24, 2015, the trial court conducted a hearing in the matter. The same day, it entered an order denying Ilene's objection, appointing attorney John Hensley as Ilene's GAL, and ordering Ilene to undergo an evaluation by a physician specializing in evaluating the elderly for mental deficiencies. Philip selected Dr. Barry Riskin, a neurologist with Christie Clinic, to perform the evaluation. On May 4, 2015, Ilene filed an objection to Dr. Riskin, and on June 8, 2015, Philip filed a motion to strike and dismiss her objection. On September 16, 2015, the trial court granted Philip's motion to strike and dismiss.

¶ 12    On October 15, 2015, Dr. Riskin examined Ilene and, on November 23, 2015, his report was filed with the trial court. In his report, Dr. Riskin stated that "[b]ased upon [his] examination, the nature and type of [Ilene's] disability [was] not known to [him]." Regarding Ilene's ability to function independently, he noted she admitted falling in her home and believed it would be best for her to live with her son. Regarding her ability to make decisions for herself, Dr. Riskin stated the information available to him was incomplete. He determined Ilene "demonstrated diminished cognitive performance on questioning and testing" but stated

he could not say if she was able to make decisions for herself. Dr. Riskin's report further stated as follows:

> "The patient reportedly has an eighth grade education. She did reportedly receive training as a hairdresser later in life. I know little else about her ability over the years to manage her estate. She was unable to tell me much about this. Her adaptive behavior appears to be appropriate given the constraints of age and physical condition. Her social skills appear to be normal for her age.
>
> I do not have an opinion as to the need for, type, and scope of guardianship recommended nor do I have a recommendation regarding the most suitable living arrangement for [Ilene].
>
> These questions would best be answered after additional evaluation such as formal neuropsychometric analysis as recommended by Dr. Daniel Llano. [*sic*] the patient's neurologist and Alzheimer disease specialist."

¶ 13    Along with his report, Dr. Riskin submitted a "progress note," describing his examination of Ilene. He stated that, for the appointment, he reviewed "notes from Carle, including those of [Ilene's] primary care physician and neurologist." Dr. Riskin also noted Ilene was accompanied to his office "by her son, Mr. Dawson." According to Dr. Riskin, during their October 15, 2015, appointment, Ilene reported that she was born in Tennessee and described having an older brother and sister, two younger brothers, and one younger sister. She stated her father was a coal miner, she went to school until the eighth grade, and she had worked as a hairdresser. Ilene further reported having three sons, whom she was able to name. Additionally, she reported that she lived with her son after falling in her home and stated "she felt she was 'not safe' alone."

¶ 14    However, Dr. Riskin's progress note also stated that, during the same appointment, Ilene denied having falls and could not tell him her age, birth date, or "how many siblings she had." She could not recall her husband's first name or how they met. Dr. Riskin noted Ilene's son seemed surprised that Ilene "was unaware that she had been married once before" and informed Dr. Riskin that Ilene had been married twice. Further, Ilene reported that "she had one granddaughter that she knew of" but she was unsure if she had any additional grandchildren or great grandchildren. According to Dr. Riskin, Ilene also "could not tell [him] about her past medical history or what medicines if any she was taking." He stated she recognized that she was "seeing the doctors recently" and stated "she was sorry that 'there was all this fuss.' "

¶ 15    Dr. Riskin described Ilene as being "agreeable" to an examination and testing, but noted her son informed him that Ilene "tended to do poorly when 'under stress' such as this encounter." With respect to Ilene's mental status examination, Dr. Riskin stated her "mocatest [(MoCA Test, that is, Montreal Cognitive Assessment test)] Score [was] 8/30, adding one point for eighth-grade education raising the score to 9/30." Further, he stated as follows with respect to Ilene's neurologic examination:

> "She is attentive, affable, even charming. The voice is soft. The speech is mostly clear. Language is normal. Facies are symmetric, the gaze is conjugate, there is no ptosis. The eyes move in all directions of gaze without nystagmus or gaze paresis. Motor strength is diminished and commensurate with age. There is no frank dystaxia. Deep tendon reflexes were absent."

¶ 16 On December 3, 2015, Hensley, Ilene's GAL, filed a report in the matter. Initially, Hensley stated that he spoke with Philip by telephone. Philip alleged the existence of "a Kirk Family Revocable Living Trust," which was of unknown value. According to Philip, the trust was established in 2002 by Ilene's second husband and "may have had as much as a million dollars in it at some point." Philip maintained the trust was " 'dismantled' " by John, acting as Ilene's agent but had no documentation of the trust or its dismantling.

¶ 17 Hensley stated Philip reported seeing Ilene three times in the past five years but speaking to her by telephone every other day. Philip asserted he visited Ilene in Champaign in the summer of 2014 and she let him into her house "even though she did not know him" and was alone. Philip also reported speaking on the telephone with Ilene earlier in the day. He maintained "she had been unable to comprehend things he told her." When Philip asked to speak with John, John refused to speak with him. On May 4, 2015, Philip left a message for Hensley and asserted that John was not allowing Philip to speak with Ilene. Hensley further stated that Philip asserted he intended to move to Illinois to care for Ilene in the event he was appointed her guardian.

¶ 18 On May 14, 2015, Hensley met with Ilene in her home. John was also present. Hensley described the home as well maintained with a "bright and immaculate" interior. He observed Ilene to be "physically frail but alert and cordial." According to Hensley, Ilene stated "she was aware Philip had initiated guardianship proceedings and commented he 'just wants control of things.' " Hensley further described his interactions with Ilene as follows:

> "[Ilene] said she paid her own bills until recently, [*sic*] (though she was vague about what she meant by 'recently'). She seemed uncertain about whether or not she had signed any powers-of-attorney to permit others to pay bills on her behalf. She said she has money in a bank in Paxton and believed the family trust still exists. However, she knew nothing about documentation. She said Philip telephones her 'occasionally,' without being more specific. When he does, they talk and get along. She said, though, that John is retired, and she prefers her circumstances as they are. John is attentive to her needs and spends a good deal of time with her.
>
>     Some of Ilene's answers to my questions were not responsive. Instead, she would 'answer' with information about her mother or with anecdotes from years and places ago. It was unclear whether such unresponsiveness was the result of fatigue, of the discomfort of being questioned about her personal life, of diminished mental acuity, or of some combination thereof. However, it was clear that at least some of the last was in play."

¶ 19 Hensley stated that, following the visit, he learned Ilene bought new hearing aids, raising a question as to whether her impaired hearing affected her responses. On October 27, 2015, he met with Ilene a second time and noted she "expressed mild exasperation at the ongoing guardianship proceedings." Hensley found Ilene's responses to his questions and their overall conversation was "less tentative" than during their initial visit. As a result, he believed Ilene's hearing aids had helped her and that her cognitive deterioration was not as great as he first thought. Nevertheless, Hensley stated that, a couple of times, Ilene "lapsed into twice told-tales about her earlier life that, while interesting, were no[t] quite apropos of anything at hand."

¶ 20 Additionally, Hensley stated John was present at both visits and spoke with him. John reported that he and Ilene got along well and "relate[d] easily with one another." John also asserted he took Ilene to medical appointments and social activities. He made sure Ilene's bills

were paid but reported she oversaw what he did with her money. Hensley understood John to mean that he kept no secrets from Ilene about where her money went.

¶ 21 Due to Philip's allegations of "financial irresponsibility" by John, Hensley stated he "sort of" engaged in discovery and reviewed certain financial documents, including "statements of the account of [*sic*] in the name of Kirk Family Revocable Living Trust, (Ilene as Trustee), at the Farmers-Merchants National Bank in Paxton, from January 1, 2011, through May 8, 2015." Hensley noted no actual trust documents were presented for his review and he could not "say what became of the trust—or if it ever existed." He concluded that "[a]bsent a more satisfying explanation than [he had] heard from anyone or found, [he had] no opinion about the significance, if any, of Philip's allegations about the trust and its 'dismantling.' "

¶ 22 Ultimately, Hensley stated he saw nothing "that suggested any impropriety in the management of Ilene's assets" by either Ilene or John. However, Hensley noted he did observe six payments to Philip through checks or wire transfers from 2009 to 2013, in amounts totaling $18,800. Hensley stated some of the payments were described as loans but he found no evidence of any repayment by Philip to Ilene.

¶ 23 Hensley further stated that Ilene did not believe she required a guardian and believed she and John were managing her affairs to her satisfaction. Ilene did not want Philip to be her guardian and opposed any change of residence. Hensley stated he had "no reason to believe Philip would not act lovingly toward his mother." However, he also had "current and long-standing evidence that John ha[d] done, and [was] doing, so." Regarding the appropriateness of a guardianship, Hensley opined as follows:

"(1) Ilene is a 'person with a disability,' as that term is defined in [the Probate Act]. Mental deterioration and physical incapacity combine to render her 'not fully able to manage [her] person or estate.'

(2) In light of the [requirements of the Probate Act], and without knowing Dr. Riskin's opinions or the significance, if any, of the allegations about the trust and its disposition, I do not believe the extent of Ilene's disability is such as to warrant a guardianship.

These opinions would be affected by a medical opinion that Ilene is substantially less competent than she appears to be and by confirmation of Philip's allegations about the trust. Absent either of those developments, Ilene's circumstances appear not to be broken, and, therefore, not in need of being fixed."

¶ 24 Also on December 3, 2015, the trial court conducted a hearing in the matter. Philip requested that the referral to Dr. Llano recommended by Dr. Riskin "be made and that [Ilene] be seen." Both Ilene and John objected to that request, while Hensley asserted he did not have anything to add other than what was in his report. However, he noted that "by all appearances" Ilene's situation was "working well" for her and if evidence existed which would indicate otherwise, he had not seen it. The court noted Philip had selected Dr. Riskin to perform the evaluation and stated as follows:

"So, I guess my thought is, you had one shot at this and at this point, since we don't have a report, I'm not necessarily ruling to send a 95 year old woman over to another facility, yet again, to have another evaluation, especially with the weather turning badly and the possibility of all sorts of communicable diseases at these facilities. So, at this

- 6 -

point, *** if you're asking—formally asking the Court to order another evaluation, at this point I'm going to deny that request."

Ultimately, however, the court continued the matter to give Philip the opportunity to speak with Dr. Riskin "to see if he misunderstood what he was supposed to do, and perhaps *** provide a report that would comply with the statute."

¶ 25 On January 7, 2016, the parties appeared before the trial court. Philip's counsel noted he had contacted Dr. Riskin's office but Dr. Riskin was unwilling to speak with anyone directly or provide any additional information.

¶ 26 On January 14, 2016, Ilene filed a motion to strike and dismiss Philip's guardianship petition pursuant to sections 2-615 and 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615, 2-619 (West 2014)). She argued Philip's petition "did not comport with" section 11a-9 of the Probate Act, in that it was not accompanied by a report, which met the requirements of that section. Ilene noted Dr. Riskin did not offer an opinion that she was a person with a disability, state that she was unable to function independently, or recommend a guardianship. She attached Dr. Riskin's report and progress note to her motion. Ilene also argued she executed a valid health-care power of attorney in November 2014, and was regularly cared for by Dr. Syed, whose April 2015 letter she attached to her filing. Additionally, Ilene pointed out that Hensley concluded a guardianship was unnecessary. She further argued as follows:

"[Section 2-619 of the Code] provides that dismissal is proper where the claim asserted by the moving party is barred by other affirmative matters which defeat the claim. [Philip's petition] is also subject to dismissal pursuant to [section] 2-615 since the burden was on Philip *** to present a *prima facie* pleading containing clear and convincing specific factual allegations. The statements in the pleadings by Philip *** did not contain specific dates or details of personal encounters. The pleading is really a statement of the conclusions of Philip *** without facts, and are insufficient to proceed further."

¶ 27 On February 3, 2016, Philip filed a response to Ilene's motion to strike and dismiss. He maintained dismissal of his guardianship petition was unwarranted with respect to both sections 2-615 and 2-619 of the Code. With respect to section 2-619, he maintained Ilene failed to present an "affirmative matter" sufficient to support a dismissal of his guardianship petition. Philip argued that the "lack of a proper physician's report" was not the type of affirmative matter upon which a section 2-619 dismissal could be based. Additionally, he asserted Dr. Syed's letter was insufficient because it was neither a proper physician's report as contemplated by section 11a-9 of the Probate Act, nor an affidavit.

¶ 28 In addressing a dismissal pursuant to section 2-615 of the Code, Philip asserted Dr. Riskin's report was sufficient to meet statutory requirements and could have supported a determination by the court that a guardianship was necessary. In an effort to put unexplained information in Dr. Riskin's report into context, Philip attached computer printouts from various websites to his response, containing information on diagnosis codes, cognitive tests used to detect dementia, and "MoCA" test scores.

¶ 29 On February 18, 2016, the trial court conducted a hearing on Ilene's motion to dismiss. Following the parties' arguments, it denied Ilene's section 2-615 motion to dismiss, stating it did not believe there was any basis upon which the court could grant that motion. However, it granted Ilene's motion to dismiss pursuant to section 2-619 of the Code. In so holding, it noted

Dr. Riskin's report was "pretty much useless," as it "did not have any type of recommendations, did not have any type of findings," and was insufficient to support Philip's petition. The court reiterated its rationale behind declining to order a second evaluation on Ilene, stating as follows:

"Obviously with the proposed ward being 95 years old, we have some significant concerns with respect to her ability to be transported around this community, and certainly, with respect to her physical well-being. So certainly, I do not believe it's in her best interest to require multiple visits to multiple sights [*sic*] in order to obtain physician reports. So certainly, I have grave concerns with respect to requiring more than—than one report due to the nature of what is involved. And that's the reason why the Court denied the request for *** a successor physician to examine her."

¶ 30    The trial court went on to state that Ilene's section 2-619 motion to dismiss was well taken due to the fact that the court did not "have any physician's report to support this petition." It stated that, without a physician's report, there were insufficient facts to be able to proceed. The court went on to state that, although the result would have been "more clear cut" if Dr. Syed's letter had been in the form of an affidavit, it nevertheless found the information provided by Dr. Syed and Hensley led it to believe dismissal pursuant to section 2-619 was warranted.

¶ 31    On March 3, 2016, the trial court entered an order dismissing Philip's guardianship petition with prejudice. On March 28, 2016, Philip filed a motion to reconsider, which the court denied.

¶ 32    This appeal followed.

¶ 33                                II. ANALYSIS

¶ 34    On appeal, Philip challenges the trial court's dismissal of his guardianship petition. He argues that the court erred in dismissing his petition pursuant to section 2-619(a)(9) because no "affirmative matter" was presented to defeat his claim. Philip also contends that the court erred in denying his request for an additional evaluation of Ilene as recommended by Dr. Riskin.

¶ 35                              A. The Probate Act

¶ 36    The Probate Act provides that, upon the filing of a petition for guardianship, the trial court has authority to adjudge a person disabled and appoint a guardian of the person, estate, or both. 755 ILCS 5/11a-3(a) (West 2012). A "disabled person" is defined as "a person 18 years or older who *** because of mental deterioration or physical incapacity is not fully able to manage his person or estate." 755 ILCS 5/11a-2(a) (West 2012). Disability must be demonstrated by clear and convincing evidence. 755 ILCS 5/11a-3(a) (West 2012). Once the court adjudges a person disabled, it may appoint a guardian of the person "if it has been demonstrated by clear and convincing evidence that because of his disability [the disabled person] lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his person." *Id.* It may appoint a guardian of the estate "if it has been demonstrated by clear and convincing evidence that because of his disability [the disabled person] is unable to manage his estate or financial affairs." *Id.*

¶ 37    Additionally, section 11a-9(a), (b) of the Probate Act (755 ILCS 5/11a-9(a), (b) (West 2012)) provides for the submission of a report addressing the alleged disabled person's condition and need for a guardianship. That section states as follows:

"(a) The petition for adjudication of disability and for appointment of a guardian should be accompanied by a report which contains (1) a description of the nature and type of the respondent's disability and an assessment of how the disability impacts on the ability of the respondent to make decisions or to function independently; (2) an analysis and results of evaluations of the respondent's mental and physical condition and, where appropriate, educational condition, adaptive behavior and social skills, which have been performed within 3 months of the date of the filing of the petition; (3) an opinion as to whether guardianship is needed, the type and scope of the guardianship needed, and the reasons therefor; (4) a recommendation as to the most suitable living arrangement and, where appropriate, treatment or habilitation plan for the respondent and the reasons therefor; (5) the signatures of all persons who performed the evaluations upon which the report is based, one of whom shall be a licensed physician and a statement of the certification, license, or other credentials that qualify the evaluators who prepared the report.

(b) If for any reason no report accompanies the petition, the court shall order appropriate evaluations to be performed by a qualified person or persons and a report prepared and filed with the court at least 10 days prior to the hearing." 755 ILCS 5/11a-9(a), (b) (West 2012).

¶ 38                                    B. Section 2-619 Dismissal

¶ 39        "A motion to dismiss under section 2-619 admits the sufficiency of the complaint, but asserts affirmative matter that defeats the claim." *Leetaru v. Board of Trustees of the University of Illinois*, 2015 IL 117485, ¶ 40, 32 N.E.3d 583. In particular, section 2-619(a)(9) provides for dismissal when the claim "is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2014).

"The standard articulation of 'affirmative matter' is:

'[A] type of defense that either negates an alleged cause of action completely or refutes crucial conclusions of law or conclusion of material fact unsupported by allegations of specific fact contained or inferred from the complaint *** [not] merely evidence upon which defendant expects to contest an ultimate fact stated in the complaint.' " *Smith v. Waukegan Park District*, 231 Ill. 2d 111, 121, 896 N.E.2d 232, 238 (2008) (quoting 4 Richard A. Michael, Illinois Practice § 41.7, at 332 (1989)).

¶ 40        When the grounds for dismissal "do not appear on the face of the pleading attacked[,] the motion [to dismiss] shall be supported by affidavit." 735 ILCS 5/2-619(a) (West 2014). Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013) sets forth the requirements for affidavits supporting a section 2-619 motion to dismiss, providing as follows:

"[Affidavits] shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto."

¶ 41    "In ruling on the motion, the circuit court must interpret all pleadings and supporting documents in the light most favorable to the nonmoving party." *Richter v. Prairie Farms Dairy, Inc.*, 2016 IL 119518, ¶ 18, 53 N.E.3d 1. The grant or denial of section 2-619 motion to dismiss is subject to *de novo* review. *Id.*

¶ 42    Initially, we note that, although Ilene filed her motion to dismiss pursuant to both sections 2-615 and 2-619 of the Code, she failed to comply with the statutory requirements regarding combined motions. Under the Code, section 2-615 and 2-619 motions to dismiss may be filed together in a single motion. 735 ILCS 5/2-619.1 (West 2014). However, such a combined motion must be "in parts" and each part must specify the section to which it pertains and be limited to that section. *Id.* Each part must "also clearly show the points or grounds relied upon under the Section upon which it is based." *Id.* In the instant case, Ilene's section 2-615 and section 2-619 claims were improperly commingled as they were not separated into parts. Further, we note she failed to identify the particular section 2-619 subsection under which her claims were brought. Additionally, although she described subsection (a)(9) by arguing section 2-619 permits dismissal where a claim "is barred by other affirmative matters," Ilene failed to specify what "affirmative matter" barred Philip's petition.

¶ 43    Nevertheless, despite the deficiencies in Ilene's motion, the trial court conducted a hearing and, ultimately, found dismissal appropriate under section 2-619. The record reflects Ilene relied on Dr. Riskin's report, the GAL's report, and Dr. Syed's letter in arguing dismissal was appropriate. The court determined a dismissal under section 2-619 was "well-taken" because no physician's report supported the guardianship petition. Philip argues that the trial court erred in granting Ilene's section 2-619 motion to dismiss because she failed to identify any "affirmative matter" to defeat his claim. For the reasons that follow, we agree with Philip.

¶ 44    Both before the trial court and on appeal, the parties have cited appellate court decisions providing that a physician's report, containing opinions that the alleged disabled individual is not disabled, can be relied upon as "affirmative matter" sufficient to support a section 2-619 dismissal. See *In re Estate of Silverman*, 257 Ill. App. 3d 162, 628 N.E.2d 763 (1993); *In re Estate of Hanley*, 2013 IL App (3d) 110264, 995 N.E.2d 596. Philip argues those cases are distinguishable from the present case, and we agree.

¶ 45    In *Silverman*, 257 Ill. App. 3d at 163, 628 N.E.2d at 765, the petitioner alleged his brother, Charles, was disabled and sought to be appointed as the guardian over both Charles's person and estate. His petition for guardianship was not accompanied by a physician's report indicating that Charles was mentally disabled. *Id.* Charles, however, filed motion to dismiss that "was accompanied by a medical report in the form of an affidavit signed by [Charles's] family physician." *Id.* at 164, 628 N.E.2d at 766. The physician averred that he had been Charles's physician for 30 years, had recently examined Charles, and Charles was mentally competent to make personal and financial decisions on his own. *Id.* at 164-65, 628 N.E.2d at 766. Charles also attached a GAL's report to his motion, in which the GAL described his interview with Charles and determined he did not need a guardian. *Id.* at 165, 628 N.E.2d at 766. Ultimately, the trial court granted Charles's motion to dismiss. *Id.* at 168, 628 N.E.2d at 768.

¶ 46    On review, the First District affirmed the trial court's dismissal, finding that, although Charles's motion had been unlabeled, it was "apparently" brought under section 2-619(a)(9). *Id.* at 172-73, 628 N.E.2d at 770-71. In reaching its decision, the court found the "report" by Charles's doctor met statutory requirements, showing the doctor "evaluated [Charles's]

physical and mental condition, found no disability, stated that [Charles] did not require a guardian, recommended no change in his living arrangements, and signed the report." *Id.* at 169, 628 N.E.2d at 768-69.

¶ 47	In *Hanley*, 2013 IL App (3d) 110264, ¶ 12, 995 N.E.2d 596, a son filed a petition for the appointment of a guardian for his father, asserting his father was incapable of managing either his person or estate because of age and infirmity. The father filed a motion to dismiss the son's petition under section 2-619, asserting "his lack of disability as affirmative matter." *Id.* ¶ 15. He supported his section 2-619 motion with medical reports from two of his treating doctors indicating the father was not disabled, the doctors' affidavits, and his own affidavit. *Id.* ¶¶ 16-21. The trial court granted the father's motion to dismiss, finding the son "had not attached any medical report or affidavits establishing disability as defined in the statute, while [the father] had submitted medical reports and affidavits of [his treating doctors] which complied with the statute and which asserted facts refuting [the father's] alleged disability." *Id.* ¶ 29.

¶ 48	On review, the Third District found the trial court correctly dismissed the son's guardianship petition. *Id.* ¶ 49. It noted the son did not attach a section 11a-9(a) (755 ILCS 5/11a-9(a) (West 2010)) report to his petition for guardianship, while the attachments to the father's motion to dismiss had been compliant with both that section and Illinois Supreme Court Rule 191(a) (eff. July 1, 2002), which applies to affidavits submitted in conjunction with a section 2-619 motion to dismiss. *Id.* ¶¶ 49-52. The court also noted that both the GAL's opinions and the father's own affidavit supported dismissal. *Id.* ¶¶ 53-54. It found the father satisfied his burden of producing affirmative matter to defeat the guardianship petition and the burden shifted to the son to show the affirmative matter was unfounded or required the resolution of essential, material facts before it was proved, which the court concluded he did not do. *Id.* ¶ 55.

¶ 49	Here, Ilene attached both Dr. Syed's letter and Dr. Riskin's report and progress note to her motion. However, Dr. Syed's four-sentence letter was simply that—a letter. Although section 2-619 requires that motions to dismiss be supported by affidavit when the grounds for dismissal do not appear on the face of the attacked pleading, Dr. Syed's letter was not in the form of an affidavit. Most notably, the letter was not sworn to by Dr. Syed before an authorized person. See *Essig v. Advocate BroMenn Medical Center*, 2015 IL App (4th) 140546, ¶ 43, 33 N.E.3d 288 (finding a "written report was not an affidavit, meaning it was not sworn to, notarized, or otherwise made under oath"). Additionally, at a minimum, an affidavit must (1) be made on the personal knowledge of the affiant; (2) set forth facts with particularity; (3) have attached sworn or certified copies of documents relied upon by the affiant; (4) not consist of conclusions but of facts admissible in evidence; and (5) affirmatively show that the affiant, if sworn, could testify competently to the information in the affidavit. Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013). Dr. Syed's letter failed to meet these requirements because it did not set forth facts in detail; provided only conclusions regarding Ilene's ability to make decisions; and failed to reflect that, if sworn, Dr. Syed could testify competently to the information in the letter.

¶ 50	Dr. Syed's letter also failed to meet the statutory requirements of section 11a-9 of the Probate Act. In particular, the letter did not address the issue of any disability Ilene might have or provide an analysis or results of any evaluation performed by Dr. Syed. Although Dr. Syed asserted Ilene "was able to make her own day to day decisions" and was "oriented to time,

- 11 -

place, and person," she did not specifically address the issue of a guardianship or the most suitable living arrangement for Ilene. Moreover, we note the letter provided minimal information regarding Dr. Syed's relationship to Ilene and failed to describe their last contact in any detail.

¶ 51 The record reflects Philip raised objections to Dr. Syed's letter before the trial court and the court expressed its own concerns that the letter was not an affidavit. Nevertheless, the court considered Dr. Syed's letter and found it supported dismissal of Philip's petition. We find any reliance on Dr. Syed's letter was error as it was not in the form of an affidavit, provided only minimal information, and failed to meet the statutory requirement of section 11a-9. Dr. Syed's letter should not have been considered and was insufficient to constitute "affirmative matter" upon which to base a section 2-619 dismissal.

¶ 52 As stated, the record reflects Ilene also relied on Dr. Riskin's report to support her motion to dismiss. However, we also find this report insufficient to constitute "affirmative matter" which defeats Philip's claim. Specifically, Dr. Riskin's report reflects that, while he determined Ilene demonstrated "diminished cognitive performance on questioning and testing," he stated the nature and type of her disability was not known to him and had no opinion as to her need for a guardianship or her most suitable living arrangement. Thus, unlike the reports relied upon in *Silverman* and *Hanley*—which were wholly supportive of the respondents' contentions that guardianships were unwarranted—Dr. Riskin's report was equivocal and cannot be said to negate Philip's petition by refuting critical conclusions of law or fact.

¶ 53 Further, although we find this case is dissimilar from *Silverman* and *Hanley*, in that Dr. Syed's letter and Dr. Riskin's report fell far short of the reports and affidavits submitted in those cases, we also find that a section 2-619 motion to dismiss was not the appropriate vehicle for Ilene's attack on Philip's petition. An affirmative matter is not evidence that merely refutes a well-pled fact in the plaintiff's complaint. *Reynolds v. Jimmy John's Enterprises, LLC*, 2013 IL App (4th) 120139, ¶ 34, 988 N.E.2d 984. "Accordingly, section 2-619(a)(9) does not authorize the defendant to submit affidavits or evidentiary matter for the purpose of contesting the plaintiff's factual allegations and presenting its version of the facts." *Id.* Stated another way, "[s]ection 2-619(a)(9) does not authorize motions asserting plaintiff's essential allegations are 'not true'—the motion accepts all well-pleaded facts as true—and is not a shortcut to resolve factual issues about the veracity of plaintiff's essential allegations." *Id.* ¶ 53. "Where a defendant seeks to address the complaint's factual allegations, a summary judgment motion *** is the proper vehicle. [Citations.]" *Id.* ¶ 34.

¶ 54 Here, in her motion to dismiss, Ilene essentially denied the allegations set forth in Philip's petition, *i.e.*, that she was a disabled person and in need of a guardianship over both her person and estate. In other words, she contested Philip's factual allegations, asserting they were not true, and attempted to present her own version of the facts. Such an attack on Philip's petition should have been made by a summary judgment motion rather than a section 2-619 motion to dismiss.

¶ 55                                    C. Further Medical Evaluation

¶ 56 On appeal, Philip also argues the trial court erred in refusing to order that Ilene undergo further evaluations. He contends section 11a-9 of the Probate Act contemplates that more than

- 12 -

one evaluation may be appropriate and, thus, section 11a-9 provided authority for the trial court in this instance to order an evaluation by Dr. Llano "as recommended" by Dr. Riskin.

¶ 57    As stated, section 11a-9(b) of the Probate Act (755 ILCS 5/11a-9(b) (West 2012)) provides that "[i]f for any reason no report accompanies the [guardianship] petition, the [trial] court shall order appropriate evaluations to be performed by a qualified person or persons and a report prepared and filed with the court at least 10 days prior to the hearing." In this instance, the trial court ordered such an evaluation at Philip's request. The record reflects Philip selected Dr. Riskin, whom he describes on appeal as "a specialist who diagnoses brain disorders, like Alzheimer's disease." Philip selected Dr. Riskin after the court rejected his initial selection of an evaluator because the individual was not a medical doctor and due to the distance Ilene would be required to travel for the evaluation. Although Philip is dissatisfied with the report Dr. Riskin ultimately provided, his dissatisfaction does not require that the trial court order additional evaluations. The record shows the court complied with statutory requirements and we find it did not abuse its discretion in denying Philip's request to order a further evaluation.

¶ 58                                    III. CONCLUSION

¶ 59    For the reasons stated, we affirm the trial court's denial of Philip's request to order Ilene to undergo further evaluation, but we reverse the court's dismissal of Philip's guardianship petition pursuant to section 2-619(a)(9) of the Code and remand the matter for further proceedings.

¶ 60    Affirmed in part and reversed in part; cause remanded.